## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEFFREY PODOLSKY,<br><br>Defendant. | CRIMINAL NO. *15cr 10132*<br><br>VIOLATION:<br>18 U.S.C. § 1349 – Conspiracy to<br>Commit Health Care Fraud |

## **INFORMATION**

The United States Attorney charges that:

### **BACKGROUND**

1.      The defendant **JEFFREY PODOLSKY ("PODOLSKY")**, a resident of New York, was an employee of Warner Chilcott.

2.      Warner Chilcott is a pharmaceutical company incorporated in Ireland with headquarters in Rockaway, NJ. Warner Chilcott manufactures and distributes a number of pharmaceuticals, including Actonel and Atelvia, which are drugs taken to prevent and treat osteoporosis.

3.      **PODOLSKY** worked at Warner Chilcott between 2009 and 2013. From 2009 to December 2011, **PODOLSKY** was a District Manager in Warner Chilcott's osteoporosis division, which sold Actonel and Atelvia. **PODOLSKY** supervised a team of 10-12 sales representatives covering portions of New York City and Long Island.

4.      In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care for persons

aged 65 and older, and for persons with disabilities. The funds set aside by Congress to pay for

the necessary medical care of these elderly Americans, and any premiums paid by such persons,

were referred to as the Medicare Program Trust Funds.

5.      Medicare Part C (also known as Medicare Advantage Plans) and Medicare Part D

provide for the coverage of prescription pharmaceutical drugs.

6.      Health insurance plans, including Medicare Advantage Plans and Medicare Part

D, generally categorize pharmaceuticals within tiers on the "formulary" of prescription drugs

that are covered. Typically, the top tier is reserved for generic drugs and is the least expensive

for the patient. The lower tiers include branded drugs, but the lower the tier, the greater the out-

of-pocket cost to the patient. If a drug is not on the formulary at all, the patient must pay the full

cost of the drug.

7.      If a physician wants a patient to have a drug that is either not on the formulary, or

is on a lower tier, the physician may submit a prior authorization or non-formulary coverage

request (collectively, "PA") to the insurance company. Insurance companies, including

Medicare, require prior authorization of prescription drugs that are either not on formulary or on

a lower tier to ensure that the prescription drug is being used correctly and only when medically

necessary. In the PA, the prescribing physician must explain why the patient needs the drug and,

frequently, must document that the patient has tried a generic and/or alternative medicine and it

has failed. If satisfied that the prescription drug is medically necessary for the particular patient,

the insurance company will grant the prior authorization and cover the cost of the prescription.

8.      Because the PA requires both medical judgment and specific knowledge of a

patient's medical condition, the PA must be prepared by the patient's physician, or a member of

the physician's staff at the physician's direction. Thus, as **PODOLSKY** knew and understood,

2

no one outside of the physician's office, including a sales representative from a pharmaceutical company, is permitted to have any involvement in the preparation of a PA. Furthermore, **PODOLSKY** knew and understood that it was a violation of the Health Insurance Portability and Accountability Act (HIPAA) for a sales representative from a pharmaceutical company to view a patient's medical file.

## COUNT ONE:  Conspiracy to Commit Health Care Fraud
## 18 U.S.C. § 1349

9.      The allegations in paragraphs one through eight are herein realleged and incorporated in full.

10.     From 2010 to in or about 2011, in New York and elsewhere, the defendant

### JEFFREY PODOLSKY

knowingly and willfully conspired and agreed with others to execute a scheme and artifice to defraud the Medicare program, a health care benefit program as defined under Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

11.     Actonel belonged to a class of pharmaceuticals called bisphosphonates. Physicians prescribed bisphosphonates for the prevention and treatment of osteoporosis.

12.     By 2009, one of the bisphosphonates on the market was Fosamax in generic form. There were few, in any, clinical differences between generic Fosamax and Actonel.  However, generic Fosamax was considerably less expensive than Actonel.

13.     In 2010, certain insurance plans in New York City and Long Island removed Actonel from their formularies in favor of Fosamax.  Many doctors were reluctant to prescribe a drug for a patient that was not covered by an insurance plan.  As **PODOLSKY** knew and understood, these insurance plans would not pay for Actonel unless a physician submitted a PA requesting the drug for a particular patient.  However, as **PODOLSKY** knew and understood, preparing a PA for Actonel was burdensome for a typical busy physician—especially when a cheaper generic drug was available.

14.     Therefore, **PODOLSKY** directed the sales representatives that he supervised to fill out PAs for Actonel and ensure that the PAs were submitted to insurance plans.

4

15.     At **PODOLSKY'S** direction, his sales representatives filled out numerous

Actonel PAs. **PODOLSKY** shared with his sales representatives clinical justifications that he

believed would result in an insurance plan approving the PA. The sales representatives

frequently used these justifications in PAs, even though, in many cases, the clinical reasons

provided were false and used simply to gain approval of the PA. On other occasions, sales

representatives reviewed a patient's medical chart to obtain justifications for the PA, in violation

of HIPAA. Some physicians were aware that **PODOLSKY's** sales representatives were filling

out PAs; indeed, on at least two occasions, **PODOLSKY** told doctors that sales representatives

would do the PAs if the doctors prescribed Actonel. In some instances, however, the physicians

were unaware that **PODOLSKY's** sales representative were filling out PAs on their behalf.

16.     In January 2011, Warner Chilcott launched Atelvia as a replacement for Actonel.

By and large, insurance plans did not include Atelvia on their formularies, primarily because a

far more inexpensive generic bisphosphonate—generic Fosamax—was available. These

insurance plans would not pay for Atelvia unless a physician submitted a PA explaining why the

patient needed Atelvia instead of generic Fosamax, Actonel, or any other bisphosphonate on the

market.

17.     Fully aware of these rules, **PODOLSKY** directed his sales representatives to

manipulate PAs for Atelvia. **PODOLSKY** instructed his sales representatives to do whatever it

took to push PAs through with insurance companies. After directing one sales representative to

fill out PAs, **PODOLSKY** became aware that the sales representative was spending several

hours each week filling out PAs. **PODOLSKY** directed the sales representative to teach other

sales representatives in his district how to complete PAs for Atelvia. Similarly, when sales

representatives in his district struggled with Atelvia's lack of insurance coverage, **PODOLSKY**

directed them to talk to the sales representatives who he knew were already filling out PAs. **PODOLSKY** also circulated to his sales representatives clinical justifications for the PAs that he believed would result in PAs being approved by insurance companies. **PODOLSKY** further instructed his sales representatives to offer physicians' office staff free dinners and gifts to encourage them to help push through PAs for Atelvia. As a result of the scheme that **PODOLSKY** directed, insurance companies, including Medicare, paid at least $200,000 for Atelvia and Actonel prescriptions that were not medically necessary and would not have been paid but for the false information submitted by Warner Chilcott sales representatives.

18.     Based in large part on the PA scheme, **PODOLSKY's** district was, far and away, the top-grossing district in the Warner Chilcott Osteoporosis Division. **PODOLSKY** was rewarded with a lucrative bonus, and, in December 2011, he was promoted to Senior District Sales Manager in Warner Chilcott's Women's Health division.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION:
## 18 U.S.C. § 982

19.    The allegations set forth in paragraphs 1 through 18 are herein incorporated in full.

20.    Upon conviction of the offense alleged in Count One of the Information, the defendant,

### JEFFREY PODOLSKY

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.  Such property includes, without limitation, the following:

    a.    a sum of money equal to $28,237.50 in United States currency, representing the amount of gross proceeds traceable to the offense.

21.    If any of the property described in paragraph 20 above, as a result of any act or omission of the defendant –

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of this Court;

    d.    has been substantially diminished in value; or

    e.    has been comingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the property described in paragraph 20 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

CARMEN M. ORTIZ
United States Attorney

By:   /s/ Miranda Hooker _____
DAVID S. SCHUMACHER
MIRANDA HOOKER
Assistant U.S. Attorneys

Dated: June 1, 2015